We'll hear argument next in number 2012, 5012, ALCATEC v. United States. Mr. Abernethy, when you are ready. May it please the Court, the issue before the Court in this case is the application of the Forfeiture of Claims Act and whether there was sufficient evidence at trial to warrant a forfeiture under that act. The question to be answered by this Court was actually framed well by the government. In its brief at page 16 when it said this, did the government prove by clear and convincing evidence that the contractor knew that its submitted claims were false and that it intended to defraud the government by submitting those claims. Here the claims at issue were seven invoices that ALCATEC submitted to FEMA for monthly inspections of FEMA trailers which were occupied by displaced victims of Hurricane Katrina. In answering the question the government posed, it's critical to understand how those invoices were prepared and who prepared them. The problem is as you go down this road of your factual discussion, don't you run up against the fact that we're supposed to be deferring to the fact finding, especially the credibility determinations made by the Court of Federal Claims even if we wouldn't necessarily have made those same findings? In certain circumstances, Your Honor. That brings up the Supreme Court case of Anderson v. City of Bessemer where the Supreme Court said the trial court cannot insulate its findings from review by denominating credibility determinations. Credibility determinations only come into play if there's conflicting evidence and credibility is used to decide and pick between two conflicting pieces of evidence. Here I hope to show you that there was no conflicting evidence as to the state of mind of the person who prepared those invoices at the time they were sent to FEMA. And that brings up the two sections of Alcatel's organization. There was a home office in Jackson. There was a field office two and a half hours away. The field office personnel made these monthly inspections of the FEMA trailers and they filled out an inspection report, about 2,000 a month, and they sent those in to the home office, sometimes by fax, sometimes hand-delivered. They did those inspections under the direction of the home office. Is that not true? That's true, Your Honor, under the direction to do it. Not necessarily the procedure by which it was done. The inspector had some latitude there, but he had to fill out that form. Wasn't the home office telling the inspectors, for example, to leave certain dates blank? No, Your Honor, and I'd like to address that. Okay, go ahead and address it. The home office of Alcatel, when they get these inspection reports from the field office, would sort the inspection reports and they would produce a summary that said which ones are valid and which ones can be billed to FEMA. Now, it's undisputed here that the only person who prepared those invoices and submitted them to FEMA was Rosemary Barber, who was the president, the CEO, and the owner of Alcatel. There's no testimony that Ms. Barber ever instructed anybody to leave a date blank. But didn't the COO make those instructions? Isn't that correct? There were four witnesses who testified without documents but from just recollection that Mr. Oliver, the operating officer, said that. That brings into play the Law on Forfeiture of Claims Act. Under the False Claims Act or under breach of contract or under negligence, Mr. Oliver's acts could be attributed to the corporation. That's not true under the Forfeiture of Claims Act, and the most stark case to that is the first Federal Savings Bank case which we saw. There's a lot of evidence in this record that, for example, Ms. Barber says to the government, we won't provide you with data manipulatable documentation so that they can review it. That sort of seems to indicate that she has something in mind, does it not, at least as far as a prior fact can determine? Your Honor, that cannot be clear and convincing evidence that at the time Ms. Barber submitted an invoice to FEMA, she knew that invoice contained invalid inspection records. Can circumstantial evidence be clear and convincing? Circumstantial evidence, if it's of the right type, can be clear and convincing. In fact, the New York Market Gardeners Association case is cited by the government, and I believe in the opinion for that position, and that case said some circumstantial evidence can rise to the level of trumping direct testimony. But here's what the court went on to say. The government has the burden to show that the circumstances are so clear and convincing that the mind can rest with safety upon the results. To simply say that Ms. Barber didn't follow the wishes of FEMA on how she submitted those invoices to FEMA. FEMA could have stopped at any point and said, we're not even going to consider another one until you do it the way we want to. They were working together. They were going back and forth on how to get that done. There's no evidence, circumstantial or otherwise, that Ms. Barber in doing that was trying to hide the fact, or that she even knew of the fact, that there were invalid inspection reports in any of those invoices. There was testimony, as I recall the record, that when people approached her and told her that there were things going wrong, that they were terminating. Is that not correct? No, sir, that's not correct. That's not in the record. The government made a loop of the fact that when one home office employee, this is way after all the invoices had been submitted, when one home office employee printed out a computer printout that she said showed some duplications, FEMA had already reviewed them at that point, and found their own duplications, but that person was later transferred into another position. There's no evidence that there was a quid pro quo there. There's no evidence that that transfer was related. In fact, it had nothing to do with the invoices being originally submitted because they had already gone in. That brings up the method in which Ms. Barber prepared these invoices. She had three home office staff people who would do what they call scrub the inspection reports. They'd sort them into notebooks, they would review them, and they would attempt to pull out any invalid report. And then they gave a summary to Ms. Barber, and that summary said here are the documents we believe are valid that you can bill FEMA for. Now, it's undisputed that Ms. Barber billed FEMA the exact numbers that her staff gave her after this scrubbing procedure. The government doesn't even allege otherwise. So, in fact, the government called two of those three home office staff members as the government's witnesses at trial, and that's the key testimony in the whole case when it comes to the Forfeiture Claims Act. What did those two witnesses say? Or more importantly, what did they not say? They're the ones who provided the summary report. They scrubbed the invoices, and they gave Rosemary Barber the numbers of what could be billed. What they didn't say is that Ms. Barber ever impeded us in any way in identifying and pulling out invalid inspection reports. So your position, let me just make sure I understand completely your legal position. Your legal position is that to the extent that we find that there were sufficient findings as it relates to Mr. Oliver, that that would fully support the False Claims Act findings that the lower court made. But you believe that would be insufficient as a matter of law under the Forfeiture Act. That's exactly right. And other than lower court decisions, like the first federal case, do you have any authority beyond that for that proposition? The cases are lower court cases that have addressed that issue. The government can't cite to one case. Well, there is one. That's the only case the government can cite to for the proposition that somebody who's not the majority owner and the president and the CEO can bind the corporation under the Forfeiture Claims Act. And what's the theory as to why the Forfeiture Claims Act would not apply normal attribution theories under the law? The statute itself says that any person who practices fraud against the government has to forfeit. So the case law has to develop. What does the word person mean in terms of a corporation? And the case law has been consistent in saying what that means is the person and the corporation have to be one and the same. When you say the case law has been consistent, you have two lower court cases, one very old and one more recent, right? And that's it. Because corporations always act through their employees, and normally whenever a corporation is charged with wrongdoing, any employee that's acting within the course and scope of their employment and acting in the interest of the corporation can bind the corporation. That's true under most causes of action. It's not true under the Forfeiture Claims Act. Is a corporation a person in Mississippi law? It's not a person. It's an artificial person, Your Honor. It's made up of its own... So what does your statute say? In California it would say a corporation is a person. Yes, it says it's a person made up of the board of directors and the stockholders of the corporation. Wagner Iron Works put it this way. That's a case cited by the government. You have to show that the individuals charged with fraud were in fact a corporation and that their fraud was a corporation's fraud. And the first federal case was very stark because there the court found that the chief financial officer and a stockholder of the company had committed fraud. But the court said that's not enough under the forfeiture statute because that person was not a corporate officer, he was not the president, and he was not the majority stockholder. The only case the government cites is Germain v. German v. United States, which is a breach of contract case for grading hay and selling it to the government in 1918 to feed government horses. And in that case the government says, well, an inspector was enough to bind the corporation. But what the court said in that case, it didn't address the issue. It's not even clear that the issue was raised on attribution. But the court did say in its findings that the president of the corporation was indicted for fraud on this very transaction, which is probably why the attribution issue was not raised. Other than that case, the government points to no case where the president, the CEO, or the majority stockholder, someone other than that person or someone other than the person who was charged with preparing invoices and submitting to the government, could be attributed to the corporation. Here Mr. Oliver was neither. He was very clear in his testimony that he had nothing to do with invoices. That was only Ms. Barber. Well, you just threw in the person who's charged with preparing the invoices. Did you intend to mean that even if that person were not the CEO or the principal owner of the corporation, that that would be enough to attribute liability for purposes of forfeiture claims? Yes, Your Honor. The case is safe. That's the exception. If the corporation charges an individual with preparing invoices and submitting to the government, then the corporation is responsible for the fraud of that person. But that's not the case. I'm not sure I understand what the doctrinal basis is for saying, well, that's the one exception. But if the corporation charges individuals with responsibility for doing other things, all of which lead to the submission of invoices, that that's not attributable to the corporation, which as Judge O'Malley alluded to is the normal rule. The question, to hearken back to the early 70s, is what did Mrs. Barber know and when did she know it? But in your example, though, of what you say the exception is, that wouldn't be the question, right? The question would be what did the person who prepared the invoices know, and even if Mrs. Barber had no idea what that person was putting in the invoices, the corporation would still be subject to forfeiture, correct? So my question to you is, logically, what's the difference between that person and the person who's sitting at the very next desk who is actually doing the fraudulent work and then is handing the invoices to the person who's actually submitting them? Why is the corporation not liable for that person? Well, that's not what the evidence showed here. Well, I understand, but what I'm trying to get at is you say, well, the rule is that only a person in a position of control, but there's an exception. So if there's an exception for the person who's submitting the invoices, for whom else is there an exception? And if not, why not? No one under the case law, Your Honor, and I think the reason is because courts... There are very few cases. So if the cases have identified a particular individual as being subject to extending the corporation's liability, that doesn't mean that that's it, right? That doesn't mean that, Your Honor. I think the rationale is that the courts disfavor a forfeiture, and if the court is going to order a forfeiture, there has to be clear and convincing evidence that the person submitting that invoice to the government or the owner of the company knew that that invoice was fraudulent when it was submitted. I'd like to reserve some time, but what I hope to hear the government say is I hope the government will point you to one fact in the record, whether it's a document or whether it's testimony, one fact in the record that shows that when Ms. Barber submitted any invoice to FEMA, she knew or had reason to know that that invoice contained an invalid inspection report. Okay. May it please the court. The court should affirm the judgment of the Court of Federal Claims. First, let me address an argument in a reply brief, and then I'll turn to the question of what is the appropriate standard to be applied under the Forfeiture of Claims Act. Why don't you address first what your opposing counsel said as to whether you can point to any one fact that shows that Ms. Barber was aware of any of this misconduct, and let me start you by directing you, since I was going to ask your opposing counsel, to Ms. Clayton's testimony on cross-examination. Well, we had both Ms. Clayton and Ms. Barrett, and Ms. Clayton, as plaintiff's counsel has pointed out, was not...performed an analysis after the invoices were prepared in question, but when she came to Ms. Barber, Ms. Clayton's testimony was she related to Ms. Barber that she observed there were duplications in the invoices, and when she reported that fact back to Ms. Barber, her testimony was Ms. Barber told her not to worry because FEMA would only check the invoices, invoice to invoice, and this is consistent with Mr. Keeney's testimony regarding the difficulty, as the court noted, paralleled Mr. Keeney's testimony about the difficulty the government had getting computerized invoices that would allow and facilitate a check of the invoices for duplications. So Ms. Clayton's testimony went to the state of mind of Ms. Barber and the knowledge of the irregularities in the preparation of the invoices, and in fact, the court at page 29 of the slip opinion specifically held that the evidence showed Ms. Barber was aware of the irregularities in Algatex invoices in general practice. There is no specific testimony with regards to Ms. Barber's knowledge of the falsified preventive maintenance inspection reports. No one, if you would, was... There was no video camera that we had in the office observing what went on. The court inferred from the testimony at trial, however, that Ms. Barber was aware, and it's especially relevant in this regard, the testimony of Ms. Jenny Jones, and Ms. Jones testified as to irregularities in Algatex preventive maintenance inspection reports, and there was much testimony at trial regarding a dispute that arose between Ms. Jones and Ms. Barber. Ms. Jones, who the court commented was an especially credible witness and an outstanding executive, testified that she became uncomfortable, was the word she used, in the changes that she noted into the invoices, that a dispute arose between herself and Ms. Barber, and on that basis she determined to exercise her contractual right to terminate the relationship. Ms. Barber, to the contrary, testified that she independently reached a determination she was unhappy with Jenny Jones, and she terminated it. But we had a witness the court found especially credible commenting that she observed the irregularities in the invoices and that those invoices caused her to leave. So certainly there was more than sufficient evidence in the record for the court to conclude that Ms. Barber had knowledge of the irregularities in the invoices. And do we have to reach that conclusion in order to affirm? Well, in order to affirm, you only have to determine that the court's conclusions, that the plaintiff has met his burden to demonstrate by clearing convincing evidence that the court's fact-finding is erroneous. We have a 37-page decision that sets forth in great detail the circumstances. That wasn't my question. My question is, do we have to agree that there is sufficient evidence as it relates to Ms. Barber? No, you do not, Your Honor. Obviously, there's a fundamental legal dispute that relates to this entire question, and that is to the extent to which an employee's conduct, other than the individual who is actually submitting the invoices, can properly be attributed to the corporation. As we pointed out, there's an old court of claims decision that assumes a lower-level employee's fraudulent acts can constitute a basis for forfeiture. Under South Corporation, that holding should be binding on this court. There's no authority in which this court has ever rejected that proposition. And in fact, the plaintiff's argument is the court should reject the stated holding in Long Island Savings, which would suggest that normal principles of agency apply. Now, this really comes to a base... There is some logic, though, to the proposition that a forfeiture act, which is a pretty dramatic penalty, that under the forfeiture act, that perhaps the standard ought to be tighter. No, there's not, Your Honor, because in ACME Corporation, the Supreme Court held that a corporation would be held criminally liable for fraud on the basis of actions by a lower-level employee and expressly apply the principles of agency. There is no logic for this court to apply a more exacting standard than the Supreme Court has held to apply in criminal proceedings. So this is a completely novel argument, an attempt to carve an exception out of the Forfeiture of Claims Act that has no support whatsoever in the case law. And as a matter of fact, it's inconsistent with decisions of this court. That is, the stated holdings of decisions of this court. And the question... What are the cases that you think are the best for you on this precise point, on this court? Uh... Decisions by this court or by the Supreme Court? I mean, the Supreme Court's decision in ACME... Either one. The Supreme Court cases are just fine. I think the stated holdings in Long Island Savings Bank are applying principles of agency to the question of fraud. I remember the Long Island Savings Bank case, but I don't remember if it was the Forfeiture of Claims. The specific provision we cited was the Forfeiture of Claims case, yes, Your Honor. And Wagner Iron speaks to a corporation being bound by its officer and agents. Now, but that's just a general... I think the distinction... The distinction that Alcatecht has attempted to draw in, Your Honor, here, is that the Court of Federal Claims should not have followed the stated holdings of the cases. That is, the stated reasoning of the court, but rather should have looked to the fact that in the decisions which they marshal in their brief, in fact, that corporate officials with authority to invoice the United States were the ones knowledgeable of the fraud. So, this case, in a way, presents a really fundamental question of common law. Is the court bound by the specific factual similarities of these decisions and by, in some mannequins, the fraud exception, or is the court bound by the stated rationale upon which prior decisions have rested? In the government's view, where the facts are present and the court states the rationale, that that constitutes controlling precedent. It's not the factual specifics of the case that controls the court, but it's the stated rationale of the court. And if you accept that proposition, the trial court's decision here, following the express holding in Long Island Savings, is unimpeachable. And only if you accept Alcatecht's contention that the court should look solely to the question of the individual facts of a case does Alcatecht's argument have any viability at all. In Long Island Savings, though, the court did not, as I recall, the court did not analyze this question as if it was analyzing a forfeiture statute and simply sort of analogized the concept of common law fraud. No, but in reaching its holding, it adopted the principle of agency. So, if you accept the proposition that courts are bound by the stated holding and analysis that the precedent that has gone before, Long Island Savings is completely dispositive of this issue. As is the Supreme Court's decision in Acme, which held principles of agency applied to criminal foreign prosecution. As I understand it, what Alcatecht has done is ably marshal the cases in which the precedent of this court have addressed the forfeiture statute and point out that in the vast majority of those cases that a principal who had the authority to submit invoices was the one implicated in the fraud. There is no logical basis for this court to abandon general principles of agency law and hold from that pattern, which Alcatecht has ably marshaled, that when a lower-level employee commits the fraud that the corporation cannot be held liable. Alcatecht identifies that a pattern of cases exists in which that relationship existed, in which the same employee responsible for the billing was the one knowledgeable concerning aspects of the fraud, but points to no case that holds or suggests that the forfeiture provision be so limited. Now, First Seven, the case that they discuss at some length in the reply brief, does seem to suggest that in the absence of someone at a high level of authority, the fraud committed by someone lower down would not be attributable to the corporation, at least in this context, does it not? I don't think you can say that. It doesn't reach the question, Your Honor. I mean, if we go down far enough, and if we divorce the knowledge of the senior people who are submitting the invoices, that there's any problem at all, and if the employee below is acting for his own interest and not acting in interest of the corporation. As a matter of general agency law, if he's off on a frolic or detour, or he's acting on his own interest, that's not attributable to the corporation, and that's well settled. But we're all assuming now a set of cases in which the employee is at least punitively acting in the interest of the corporation, but without the knowledge, direction, or complicity in any way of the people higher up in the corporation or position. If he's acting in furtherance of the interest of the corporation, and the argument was made below that that wasn't the case here. In other words, the argument was made here that the employees were acting for their own interest and this was a matter of convenience. The court, as a matter of fact, held that not to be the case, and said there was no reason for them to generate blank reports. So the issue here was the preparation of all preventive maintenance inspection reports that benefited the corporation by constitutive billing that the corporation could make to the government. Under those circumstances, under general principles of agency law, the corporation is bound. What Alcatech is asking is an exception to the general principles of agency law based upon what it recognizes as a pattern in this court's decisions and older decisions of the Court of Federal Claims. It's inconsistent with, admittedly, a hoary decision of the Court of Federal Claims, which we point out, but there's simply no basis for the court to draw that distinction. The Court of Claims. An old Court of Claims decision. I misspoke, Your Honor, excuse me. But there's simply no basis to do that. And that's fundamentally inconsistent with the Supreme Court's analysis in Acme where they held principles of agency applied in assessing corporate criminal liability. And certainly there'd be no basis for this court to find the Forfeiture of Claims Act had a more strenuous standard to be applied. Well, if we're going to apply standard fraud principles and standard agency principles, then why isn't the knowledge or lack of reliance on the part of FEMA meaningful? Because the court here specifically held, contrary to Alcatex's contention, that FEMA did not have that knowledge. The court held, the court analyzed this and held that FEMA was not aware of the extent of the irregularities in the billing, that is, the duplications and misbillings with regards to the 14-day rule. And there's no possible way that FEMA could have had knowledge of the falsification of the preventive maintenance inspection reports because that required a detailed analysis by the government and involved information provided to the Inspector General of FEMA and ultimately the FBI. And admittedly, the government acquired that knowledge, but it was through an independent civil and criminal investigation into the circumstances. So the Court of Federal Claims specifically held as a matter of fact that FEMA did not have that knowledge. Isn't there evidence in the record below that seems to imply that FEMA entered into these contracts knowingly, aggressively overpaying and that then turned around and tried to use these corporate provisions to try to get out from under the criticism that was being heaped on it for that conduct? The Court of Claims made specific factual findings in that regard and held that it wasn't the case. And I'd invite the Court to... I know what the Court of Claims found. I'm asking you, isn't there substantial evidence in the record? No, there's not. Because under the Stafford Act, the FEMA transitioned to local contractors and as the Court of Federal Claims noted, that involved inefficiencies and difficulties in managing the case. But there's nothing in the record to suggest that the government took this in retaliation that asserted fraud claims as a retaliation for FEMA's conduct. If I could, before my time expires, there's a new argument raised in the reply brief that I'd like to address briefly. And that is, at pages 10 through 12 of the reply brief, Alcatech argues that notwithstanding the submission of fraudulent claims, no basis existed for the entry of a judgment in forfeiture and that is because the contract had a quality assurance program and that any errors and omissions, including fraudulent errors and omissions, in Alcatech's submission of invoices had to be handled under that quality assurance program. This argument should be considered to have been waived by Alcatech because it was not raised in the opening brief. If it is held not to have been waived, the Court should refer to a transcript portion which is not included in the joint appendix but it appears at page 1214 through 1226 of the trial transcript. In that transcript, the trial court addressed this argument, held that the argument made no sense because it would render large portions of the contract meaningless, and called the argument laughable. And in Alcatech's counsel, a trial was asked if that really was the argument he was making and he said no. So if the Court reaches the issue, the Court should hold that it was expressly abandoned at trial and if the Court reaches the issue, the Court should hold, for the same reason the trial court analyzed, the argument simply has no merit. When Alcatech submitted invoices to the government for payment, it was clearly subject to forfeiture of its claims pursuant to the forfeiture provisions as well as provisions of the False Claims Act. For the reasons set forth in the decision below and the reason I've set forth today, this Court should affirm the decision of the Court of Federal Claims which imposed both a judgment of forfeiture and judgment under the False Claims Act. Very well, thank you Mr. Grote. Mr. Abernethy, you have about half a minute. We'll give you two minutes to rebut. Your Honor, the Agne case was not decided under the Forfeiture Claims Act. It was an anti-kickback statute. But it's certainly true, is it not, that criminal liability can be imposed on a corporation based on normal agency principles. If the statute allows it, that's true, Your Honor, and the anti-kickback statute was held to allow that. Here we're talking about forfeiture, civil forfeiture. But some criminal statutes don't speak to having corporations specifically designated as potential defendants. They're simply statutes which corporations are indicted for violating, and when that happens, it's certainly my understanding that the corporation is liable if, under agency principles, someone in the corporation who's answerable for the corporation has done the act. That's partially true in some criminal law. Here we've got a civil scheme, and the scheme is twofold. The civil scheme says a lower-level employee's acts are attributable to the corporation for purposes of collecting damages. You can sue the corporation, the government can, and recover damages for whatever that person did. But when it comes to forfeiting legitimate claims over to the government, there is a higher standard, and there's a rationale for that. And when you said there's statutory language, is there language that embodies that different standard? I should have said case law language, Your Honor. Right, I thought that was all there was. There's no statutory language for that. That's right. Now, Mr. Groats said there were no hidden cameras where they could view what Mrs. Barber was doing, but there's the next best thing here, contemporaneous documents authored by Mrs. Barber. P33 is the most important, where she tells the people scrubbing these invoices, I want you to check them and double-check them to make sure only valid inspection reports get to meet an invoice. P31 was her directive to the very Mrs. Jones that Mr. Groats referred to, in which she told Mrs. Jones very early, find out why these duplicates that FEMA keeps pointing out to me after the fact are getting through. That tells you the mindset of Mrs. Barber, and the numbers also tell you the mindset. She had 2,000 inspection reports a month for 12 months, and the government's consultant spent two years analyzing these, and he found 105 that he said were initially not dated but later dated. Could that be a scheme, a top-down scheme, to have 105 out of 20-something thousand? Thank you. Thank you, Mr. Evans. The case is submitted. We thank all counsel. All rise. The honorable court is adjourned until tomorrow morning at 10 a.m.